CLERK'S OFFICE U.S. DIST. COURT
AT ROANOKE, VA
FILED

JUN 30 2006

JOHN F. CORCORAN, CLERK
BY:
DEPUTY CLERK

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
ROANOKE DIVISION

| | |
|---|---|
| JEFFREY LEE GRAY, et al.,<br>Plaintiffs, | Civil Action No. 7:04-CV-00634 |
| v. | **MEMORANDUM OPINION** |
| GENE JOHNSON, et al.,<br>Defendants. | By: Samuel G. Wilson<br>United States District Judge |

John A. Martin, a Virginia inmate proceeding pro se, brings this 42 U.S.C. § 1983 action,[1] claiming that prison officials violated his First Amendment rights by compelling participation in the Therapeutic Community Program (TCP) at Botetourt Correctional Center (BCC), which Martin claims incorporates religious elements in violation of the Establishment Clause. The defendant prison officials[2] moved for summary judgment, and the court referred the matter to the United States Magistrate Judge for a Report and Recommendation pursuant to 28 U.S.C. § 636(b)(1)(B). The Magistrate Judge recommended that the court grant the motion for summary judgment; however, the court found that certain issues of fact remained and set the matter for trial. Having heard the testimony of Martin and several members of the TCP staff, the court is now able to make findings of fact as to the operation of the TCP during Martin's 69 days as a participant, and those findings of fact compel the court to find no Establishment Clause

---

[1] Previously, there were three other plaintiffs, Jeffrey Gray, Thomas Bozga, and Michael Francis. Francis sought voluntary dismissal, which the court granted on April 7, 2006. Gray and Bozga were sent notice of the trial, but neither appeared. Accordingly, the court finds that Gray and Bozga abandoned their claims and dismisses them with prejudice.

[2] The plaintiffs named the following former or current BCC staff as defendants: Gene Johnson, J. D. Terry, Kim Crowder-Austin, Sylvia Martin, Anne Daniel, Gary L. Bass, Carolyn Parker, C. Dudley Bush, Wendy Wareham, and Gerald Suttles. Before the trial, Martin sought to voluntarily dismiss Bass and Parker, and the court granted his motion.

violation. Accordingly, the court grants judgment in favor of the defendant prison officials.

**I.**

BCC operates the TCP for inmates with a history of substance abuse who have twelve to eighteen months left to serve. Those who qualify for the TCP either have to participate or forfeit the right to accrue good conduct time. Members of the TCP live together in a dorm, and they are required to actively participate and to encourage other members to do the same. If an inmate fails to participate satisfactorily, then he loses his good conduct time, and prison officials may transfer him to a dorm with other inmates who either refuse to participate or who have refused to cooperate once in the program. To assist in day-to-day operations, program staff designate some participants with a history of satisfactory participation as "expediters" and "coordinators," who assume various responsibilities, including announcing the schedule of activities for each day and starting each day with an inspirational reading. The TCP offers therapeutic group meetings, educational seminars, group talent shows, and Alcoholics Anonymous (AA) and Narcotics Anonymous meetings (NA). The program consists of five "phases," each of which requires the completion of a variety of tasks, ranging from demonstrating certain behavioral modifications to completing a written test. The goal of each participant is to "phase out" of the program by completing the requisite activities for each phase. To that end, participants have at their disposal a library of self-help materials.

In the 2002 case of Nusbaum v. Terrangi,[3] a United States District Court for the Eastern District of Virginia determined that a TCP at another Virginia prison violated the Establishment Clause. In response to that decision, John M. Mabe, Deputy Director of the Division of

---

[3]210 F. Supp.2d 784 (E.D. Va. 2002).

Administration and Programs for the Virginia Department of Corrections, issued a memo, directing the staff of TCP programs to implement changes to avoid Establishment Clause conflicts identified by the court's decision. He directed the removal of "the concept of 'higher power' or 'spirituality' or other terms that may be construed as non-secular" from program requirements; the removal of "[a]ll religious, higher power, or spiritual references . . . from written materials, signs, creeds and practices"; and the cessation of the mandatory use of "traditional 12 Steps, and the Non-theistic 12 Steps or Secular Organization for Sobriety" programs. Mabe also instructed that "mandatory groups [could no longer] be organized around religious topics" and that staff should "refrain from discussing their own religious beliefs or promoting religion in mandatory TC groups." Mabe cautioned, though, that "[i]n mandatory groups, inmates [were] free to express *their* religious beliefs" so long as they did not "attempt[] to impose [their] belief on others." It is uncontested that the TCP staff at BCC immediately made certain changes in light of that memo. They made AA and/or NA participation optional, removed any religious references from inspirational readings, separated religious library materials from secular ones, and established a rule allowing inmate participants to "express *their* religious beliefs" so long as they did not "attempt[] to impose [their] belief on others."

Martin only participated in the TCP from May 19 to July 27, 2004, well after implementation of Mabe's directives. Nevertheless, Martin claims that coerced participation in the program, as it existed during his brief participation, violated the Establishment Clause. At trial, Martin testified that fellow participants pressured him to adopt religious beliefs, even during mandatory group meetings, which Martin claims were devoid of TCP staff oversight. During cross-examination, Martin conceded that the TCP staff "probably think there was [no

3

religious component] because they [were] never in the programs . . . to facilitate them." Martin also claimed that he was forced to listen to a fellow participant sing a gospel song during a program talent show and that defendant Sylvia Martin discussed religion during a mandatory meeting. Martin claims that his complaints about these incidents ultimately led to his ejection from the program and the loss of his good time credits.

Former TCP Director Kim Crowder-Austin, former TCP social worker Gerald Suttles, TCP social worker Sylvia Martin, BCC Warden Jerome Terry, and current TCP Director Sandra Buell also testified at trial and contradicted much of what Martin had to say. Crowder-Austin, Suttles, and Sylvia Martin testified that TCP staff members were always present at mandatory meetings and that, implementing Mabe's directives, staff members were trained to and stood ready to draw a line between the permissible, an inmate participant discussing the personal impact of spirituality or religion on his own recovery, from the impermissible, an inmate participant proselytizing. Each staff member testified that he or she simply would interrupt a participant who crossed the line. TCP staff also testified that the single talent show cited by Martin was an optional event and that he was free to retreat to his bunk, with no fear of reprimand, if he found anything objectionable. As for the meeting at which Martin complains that Sylvia Martin discussed religion, Ms. Martin testified that she only discussed the history of the "community concept," as exemplified by the Essene community "before the birth of Christ." She insisted that the discussion was scholarly and historic in nature, not religious. Finally, TCP staff testified that, ultimately, they ejected Martin from the program not because he complained about its alleged religious content but because he refused to participate meaningfully in the program and to work toward the eventual goal of "phasing out."

From trial testimony and exhibits, the court makes the following findings of fact:

1) the primary purpose of the TCP is secular– the rehabilitation of inmates with a history of substance abuse;

2) the court does not credit Martin's testimony that TCP staff failed to oversee mandatory meetings; instead, the court credits the testimony of TCP staff members and finds that TCP staff members oversaw mandatory meetings and that, though they permitted inmates to discuss the personal impact of spirituality or religion on their own recovery, they were trained to prohibit and attempted to prohibit inmate participants from proselytizing;

3) the court credits Martin's testimony that some fellow participants outside of mandatory meetings attempted to proselytize; however, there is no credible evidence that TCP staff explicitly or implicitly authorized or otherwise enabled their efforts;

4) the court credits Martin's testimony that a participant sang a gospel song during a program talent show; however, the court credits the TCP staff members' testimony that the talent show was not mandatory and that Martin was free to leave;

5) the court credits Sylvia Martin's testimony concerning the one meeting Martin claims featured overtly religious content: Ms. Martin only discussed the history of the "community concept" as exemplified by the Essene community. There is no credible evidence that the discussion's historical garb was religious subterfuge;

6) the court credits the testimony of the TCP staff that the AA and NA portions of the program were voluntary; and

7) the court credits the testimony of TCP staff that they ejected Martin from the program because he failed to meaningfully and actively participate in the program, not because of his views or

because of his Establishment Clause complaints.

## II.

In order to demonstrate a violation of the Establishment Clause, Martin must show one or more of the following: that the TCP has a non-secular legislative purpose, that the TCP's primary effect is to advance or inhibit religion, or that the TCP fosters "an excessive government entanglement with religion." See Lemon v. Kurtzman, 403 U.S. 602 (1971); Lambeth v. Board of Commissioners of Davidson County, NC, 407 F.3d 266 (4th Cir. 2005).[4] At most, Martin has shown that fellow participants discussed the role of religion in their recovery at mandatory meetings; that some fellow participants proselytized outside the presence of TCP staff and without the staff's encouragement or imprimatur; that participants sang a single gospel song at a talent show; that Sylvia Martin discussed the Essene community from a scholarly and historic perspective at a single meeting, that the program library included secular materials as well those that some might consider religious or spiritual in nature, and that the TCP offered AA and NA

---

[4] When deciding similar cases, the Second Circuit, the Seventh Circuit, and the Eastern District of Virginia have opted to apply a more basic coercion test in lieu of Lemon. These courts have simply examined whether the challenged program accomplished coerced religious participation, finding each time that the program did. Warner v. Orange County Dep't of Probation, 115 F.3d 1068, 1074 (2d Cir. 1996) (holding that coerced participation in religion-tinged AA meetings violated Establishment Clause); Kerr v. Farrey, 95 F.3d 472, 479 (7th Cir. 1996) (holding that coerced participation in religion-tinged NA meetings violated Establishment Clause); Nusbaum v. Terrangi, 210 F. Supp.2d 784 (E.D. Va. 2002) (holding that a TCP emphasizing religion violated the Establishment Clause). As the court pointed out in Nusbaum, it is unnecessary to consider all three of the Lemon prongs if a program fails the "coercion" test because the program would necessarily fail the second prong of Lemon, the advancing or inhibiting religion prong. However, the Fourth Circuit has endorsed the Lemon test as the proper paradigm for analyzing Establishment Clause issues, choosing to incorporate other tests, such as the "coercion" and "endorsement" tests into their Lemon analysis as part of the second prong. See Mellen v. Bunting, 327 F.3d 355 (4th Cir. 2003). In any event, the court finds that Martin has failed to establish a First Amendment violation under the coercion analysis applied by other courts.

6

programs to participants on a strictly voluntary basis. Taken together, these facts are not sufficient to meet any of the Lemon criteria. Thus, the court finds that Martin has failed to prove that the TCP, as it existed during his participation, operated in violation of the Establishment Clause.[5]

A program fails the Lemon secular legislative purpose test "only if [the action] is 'entirely motivated by a purpose to advance religion.'" Mellen v. Bunting, 327 F.3d 355, 372 (4th Cir. 2003) (quoting Wallace v. Jaffree, 472 U.S. 38, 56 (1985)). The court has no doubt that the TCP's dominant purpose was the rehabilitation of soon-to-be-released inmates with a history of substance abuse. Martin has never claimed anything to the contrary, and the defendants have more than adequately demonstrated that rehabilitation was the true goal of the program and not just a "sham secular purpose." See Santa Fe Independent School Dist. v. Doe, 530 U.S. 290, 308 (2000). Accordingly, the court finds that the program passes the Lemon secular purpose test.

---

[5]The prison officials are *also* entitled to qualified immunity so long as "reasonable person[s]" in their positions would have concluded that coerced participation in the TCP, as it existed, did not violate Martin's "clearly established" rights under the Establishment Clause. Mazuz v. Maryland, 442 F.3d 217, 225 (4th Cir. 2006) (quoting Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982)). The 2002 Mabe memo and the response taken thereto are instructive. The Mabe memo distilled the tenets of the Nusbaum v. Terrangi opinion into a set of instructions for bringing TCP's into compliance with the Establishment Clause. It is uncontested that the defendant TCP staff members implemented those instructions by making AA and/or NA participation optional, removing any religious references from inspirational readings, separating religious library materials from secular ones, making use of any religious library materials completely optional, and enacting a rule prohibiting participants from proselytizing but allowing them to discuss the role the non-secular has played in their personal recovery. The Nusbaum opinion provided a nuanced picture of the Establishment Clause rights of participants in TCP programs, and the Mabe memo communicated that vision to TCP staff, who took the steps necessary to comply. The court finds that those steps, taken as a direct response to an opinion examining the interplay of TCP programs and the Establishment Clause, created an objectively reasonable belief on the part of program staff and prison officials that the program as it existed during Martin's stay did not run afoul of the Establishment Clause.

Martin also has failed to establish that the TCP's primary effect was to advance or inhibit religion. "It 'has never been thought either possible or desirable to enforce a regime of total separation.'" Brown v. Gilmore, 258 F.3d 265, 274 (4th Cir.) (quoting Comm. for Pub. Educ. & Religious Liberty v. Nyquist, 413 U.S. 756, 760 (1973)). However, a program violates the Establishment Clause when it allows or requires "the government itself . . . through its own activities and influences" to advance or inhibit religion. Madison v. Riter, 355 F.3d 310, 318 (4th Cir. 2003) (quoting Corporation of Presiding Bishop v. Amos, 483 U.S. 327, 337 (1987)). Accordingly, when striking a balance between the call of duty and the strictures of the Establishment Clause, state officers must maintain a position of "benevolent neutrality which will permit religious exercise to exist without sponsorship and without interference." Amos, 483 U.S. at 334. In deciding whether the TCP struck that balance, the court must determine whether a "reasonable observer," mindful of the government's goal of religious neutrality, "[would] fairly understand [the TCP] in its particular setting as impermissibly advancing or endorsing religion." See Lambeth, 407 F.3d at 271-72 (citing County of Allegheny v. American Civil Liberties Union, 492 U.S. 573, 598-600 (1989)). With these precepts in mind, based on the evidence adduced, the court finds that a "reasonable observer" would conclude that the defendant program officials did not advance religion "through [their] own activities and influences" but rather maintained neutrality.

A reasonable observer would not conclude that the TCP impermissibly advanced religion. A reasonable observer would not construe a single historical discussion of the Essene community, an unsolicited and unendorsed expression of faith at a talent show, the freedom of other inmates to attend AA and NA meetings, or the availability of spiritual materials in a

8

community library as indicia that the state was advancing religion. Program officials were not required to insulate Martin from the views of fellow participants. A therapeutic community that relies on the free exchange of its participants' insights and ideas to promote recovery is not required to cater to the sensibilities, ideologies, or views of individual participants simply because it operates within a prison. Thus, a reasonable observer would not equate the free expression of Martin's fellow participants with the "activities and influences" of the TCP staff. Therefore, Martin has failed to demonstrate that the program advanced or inhibited religion under the second Lemon test.

Finally, Martin has failed to establish an impermissible entanglement of government with religion. Some interaction "is inevitable, and we have always tolerated some level of involvement between the two." Agostini v. Felton, 521 U.S. 203, 232-33 (1997). An impermissible entanglement occurs when interaction between the two requires "comprehensive, discriminating, and continuing state surveillance." Lemon, 403 U.S. at 619. There is nothing in the evidence the court heard that proved an impermissible entanglement.

As an initial matter, the court finds that the TCP did not effect an impermissible entanglement merely by hosting entirely voluntary AA and NA meetings, see DeStefano v. Emergency Housing Group, Inc., 247 F.3d 397 (2d Cir. 2001) (upholding state-funded rehabilitation program with an optional AA component), by discussing the Essene community in a scholarly manner at one meeting, see Epperson v. Arkansas, 393 U.S. 97, 106 (1968) ("[S]tudy of religions and of the Bible from a literary and historic viewpoint, presented objectively as part of a secular program of education, need not collide with the First Amendment's prohibition."), or by placing some non-secular materials in the institutional library, see Board of Ed. of Central

9

School Dist. No. 1 v. Allen, 392 U.S. 236 (1968) (upholding a program allowing for the loan of secular textbooks to school children attending parochial schools despite the requirement that state actors were required to determine whether particular books were secular). Nor did the TCP become "entangled" with religion by facilitating meetings at which individual participants had the freedom to express their perceptions of their individual roads to recovery, simply because those expressions may have had religious content and because staff members were required to intervene to prohibit proselytizing. Undoubtedly, they were required to strike a delicate balance between the permissible and impermissible, but that cannot be avoided in an institutional therapeutic program that necessarily relies on the sharing of personal insights. Accordingly, the court finds that Martin has failed to prove that the program was impermissibly entangled with religion.

## III.

Programs like the TCP serve an important, secular purpose–rehabilitation. There is no indication that the program failed to strike the necessary constitutional balance between the inmates' right to speak and their right to be free from state-sponsored religious indoctrination. It is no more permissible to force participants to check their religion at the door than it is for the government to abandon its neutral role in the conflict between religion and non-religion. Accordingly, the court will enter judgment in favor of the defendants.

**ENTER:** This 30th day of June, 2006.

UNITED STATES DISTRICT JUDGE

10

Case 7:04-cv-00634-SGW-mfu   Document 166   Filed 06/30/06   Page 10 of 10   Pageid#: 909